820 So.2d 842 (2000)
James Allen JOHNSON
v.
STATE.
CR-98-1688.
Court of Criminal Appeals of Alabama.
April 28, 2000.
Rehearing Denied June 16, 2000.
*849 William Keith Bradford, Birmingham; Donald L. Colee, Jr., Birmingham; Patrick I. Gustin, Jasper; Brian Royster, Jasper; and Charles Clyde Tatum, Jr., Jasper, for appellant.
Bill Pryor, atty. gen., and James R. Houts, asst. atty. gen., for appellee.
FRY, Judge.
The appellant, James Allen Johnson, was convicted of murdering Mary Charlene "Sissy" Lawson during the course of a robbery, an offense defined as capital by § 13A-5-40(a)(2), Ala.Code 1975. The jury, by a vote of 10 to 2, recommended that Johnson be sentenced to death. The trial court accepted the jury's recommendation and sentenced Johnson to death by electrocution.
The State's evidence tended to show that on August 5, 1995, Rodney Earley discovered Lawson's body slumped behind the counter in the BP gasoline station on Old Highway 78 in Jasperunconscious from gunshot wounds to her head. Earley testified that he telephoned the emergency 911 number and that Lawson died before the ambulance could arrive.
Ira Morris,[1] Johnson's codefendant, testified that several weeks before the robbery/murder he met with Johnson and discussed plans to rob and kill the attendant at the BP station in Jasper. The two agreed that Morris would be the lookout and that Johnson would commit the robbery/murder. On the designated day the two went to the BP station. Morris testified that Johnson approached the counter purportedly to purchase a drink, and he threw his crumpled money down so the clerk would have to pick it up. Lawson stooped to pick up the money; when she straightened, Johnson was pointing a .38 caliber revolver at her head. He demanded money. After Lawson gave him the money in the register Johnson shot at the clerk four times. Morris said that Morris wiped the door clean of fingerprints and left during the shooting. The two met the next day to split the $447 that had been taken in the robbery/murder. Morris testified that he refused to take any of the *850 money because he felt remorse for what he had done.
There was also evidence presented indicating that Johnson confessed to two fellow inmates that he had committed the BP robbery/murder. There was also testimony that approximately two weeks before the robbery/murder Johnson had approached two children, had showed them a map of the area surrounding the BP station, had showed them a gun that he had hidden in his front yard, and had told them he was going to rob the BP station. The State also presented evidence indicating that Johnson, six months after the robbery/murder at the BP station, had robbed another attendant at a package store located one mile from the BP station.
Because Johnson was sentenced to death, this Court, pursuant to Rule 45A, Ala.R.App.P., will search the record for "plain error," i.e., we will review for error, whether or not that error was brought to the attention of the trial court. Rule 45A states:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
We have repeatedly recognized that the plain-error rule is to be used sparingly and only in those cases where a miscarriage of justice would result. Bryant v. State, [Ms. CR-98-0023, November 19, 1999] ___ So.2d ___ (Ala.Cr.App. 1999); Wilson v. State, 777 So.2d 856 (Ala. Cr.App.1999); Perkins v. State, 808 So.2d 1041 (Ala.Cr.App.1999); Minor v. State, 780 So.2d 707 (Ala.Cr.App.1999); Burton v. State, 651 So.2d 641 (Ala.Cr.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995).
"The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is `particularly egregious' and if it `seriously affects the fairness, integrity or public reputation of judicial proceedings.' See Ex parte Price, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Johnson v. State, 620 So.2d 679, 701 (Ala.Cr.App.1992), rev'd on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993)."
Hall v. State, 820 So.2d 113, 121-22 (Ala. Cr.App.1999).

Guilt-Phase Issues

I.
Johnson argues that the trial court erred in refusing to dismiss the second indictment issued against him. He cites several reasons for this contention.
The record reflects that in September 1996 Johnson was indicted for capital murder defined in § 13A-5-40(a)(2), Code of Alabama 1975. This first indictment read as follows:
"The Grand Jury of said County charge, before the finding of this indictment, James Allen Johnson, whose name is *851 otherwise unknown to the Grand Jury than as stated, did intentionally cause the death of Mary Charlene Lawson by shooting her with a handgun, and James Allen Johnson was in the course of committing a theft of in lawful U.S. currency the property of Don's # 3, by the use of force against the person of Mary Charlene Lawson, to-wit: a cashier at Don's # 3, with the intent to overcome her physical resistance or physical power of resistance, while the said James Allen Johnson was armed with a deadly weapon, to-wit: a handgun, in violation of Section 13A-5-40(a)(2) of the Code of Alabama, against the peace and dignity of the State of Alabama."
(Supp.R.9-10) (Emphasis added.)
Johnson was reindicted in January 1999 for capital murder defined in § 13A-5-40(a)(2). This second indictment read as follows:
"The Grand Jury of said County charges before the finding of this indictment, James Allen Johnson, whose name is otherwise unknown to the Grand Jury other than stated, did, intentionally cause the death of Mary Charlene Lawson by shooting her with a handgun, and James Allen Johnson was in the course of committing a theft of to-wit: $447.70 in lawful U.S. currency, in the possession of the said Mary Charlene Lawson, the property of Henry Oil Company, Inc., by the use of force against the person of Mary Charlene Lawson, with the intent to overcome her physical resistance or physical power of resistance, while the said James Allen Johnson or another person present was armed with a deadly weapon, to-wit: a handgun, in violation of Section 13A-5-40(a)(2) of the Code of Alabama."
(R. 8-9) (Emphasis added.)
On February 9, 1999, after the second indictment was issued the State moved to dismiss the first indictment. The trial court granted that motion.
Johnson argues that the grand jury lacked jurisdiction to issue the second indictment because it had already issued an indictment in the case. Johnson argues in his brief to this Court, "it is well established that the grand jury's role in the prosecution of a specific crime terminates upon returning a true bill of indictment for that crime." (Johnson's brief, p. 37.) He contends that the State presented new witnesses at the grand jury proceedings that resulted in the second indictment and used it to gather new informationa function, he argues, that is outside the scope of a grand jury's power. See Rule 12.3(d), Ala. R.Crim.P.
Johnson is correct in stating that a grand jury may not further investigate a case once an indictment has been issued. As our Supreme Court stated in Ex parte Williams, 710 So.2d 1350, 1354 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998):
"Rule 12.3, Ala.R.Cr.P., sets out the powers and duties of an Alabama grand jury, including the power and duty to inquire into indictable offenses. However, the power of a grand jury has its limits, as noted by the Committee Comments to Rule 12.3, which quote with approval the following statement from Fields v. State, 121 Ala. 16, 17, 25 So. 726, 727 (1899): `The functions and powers of the grand jury as to the indictment so returned are ended when the presentment is made and the indictment or true bill is received by the court.' (Emphasis added [in Williams].) Thus, although a district attorney may continue to investigate a crime until the very time of the trial, once an indictment has been returned by a grand jury the function of that grand jury is complete as to *852 that crime and the grand jury cannot be used as a means for further investigation. Stated otherwise, `it is improper to utilize a Grand Jury for the sole or dominating purpose of preparing an already pending indictment for trial.' United States v. Dardi, 330 F.2d 316, 336 (2d Cir.), cert. denied, 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50 (1964)."
The record reflects that 12 witnesses were named on the first indictment issued in 1996. The second indictment contained the name of only one witness, a police officer, who had also been named as a witness on the first indictment.
There is absolutely no evidence in the record indicating that the State used the second grand jury to gather new information about the case. The record reflects that the second indictment was issued to correct perceived defects in the first indictment. The prosecutor, at the motion hearing, stated, "no additional evidence was obtained, no investigation was done pursuant to the new one, it was just correcting an old indictment." (R. 117.) The second indictment contained the amount stolen in the robbery/murder and also changed the name of the owner of the property stolen. Johnson admits in his motion to dismiss the second indictment that he filed "numerous motions to dismiss the first indictment, challenging the sufficiency of the indictment." The State, in an attempt to correct the perceived defects, presented the case to another grand jury. This is a valid function of a grand jury. Moreover, the actions of the prosecutor were in response to the numerous motions filed by defense counsel.
Alabama law provides that an indictment, once issued, may be amended. As Rule 13.5(a), Ala.R.Crim.P., states:
"A charge may be amended by order of the court with the consent of the defendant in all cases, except to change the offense or to charge new offenses not contemplated by the original indictment. The court may permit a charge to be amended without the defendant's consent, at any time before verdict or finding, if no additional or different offense is charged and if the substantial rights of the defendant are not prejudiced."
See also § 15-8-90, Code of Alabama 1975. If the defendant does not consent to the amendment, then the procedure is to send the case back to the grand jury so that a new indictment may be issued. See § 15-8-91. That is what was done in the present case.
Also, contrary to defense's argument at the motion hearing, the first indictment does not have to be dismissed or quashed before a superseding indictment may be issued. As we have stated, "it is the better practice to bring the second indictment before the first is quashed." Johnson v. State, 479 So.2d 1377 (Ala.Cr. App.1985), quoting Perkins v. State, 66 Ala. 457, 461 (1880).
The trial court correctly denied Johnson's motion to dismiss the second indictment.

II.
Johnson argues that the trial court erred in denying his motion to strike for cause three prospective jurors who, he argues, indicated that they would automatically vote for the death penalty.
In determining whether a trial court erred in denying a strike for cause based on a juror's response to questions concerning the death penalty, we use the standard addressed by this Court in Dallas v. State, 711 So.2d 1101 (Ala.Cr.App. 1997), aff'd, 711 So.2d 1114 (Ala.), cert. denied, 525 U.S. 860, 119 S.Ct. 145, 142 L.Ed.2d 118 (1998).
*853 "In Taylor v. State, 666 So.2d 36, 47 (Ala.Cr.App.1994), this Court outlined the guidelines for determining whether a potential juror should be excluded for cause based on his or her feelings concerning capital punishment:
"`"The proper standard for determining whether a prospective juror may be excluded for cause because of her views on capital punishment is `whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."' Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); Gray v. Mississippi, 481 U.S. 648 [at 657-58], 107 S.Ct. 2045, 2051, 95 L.Ed.2d 622 (1987). `The crucial inquiry is whether the venireman could follow the court's instructions and obey his oath, notwithstanding his views on capital punishment.' Dutton v. Brown, 812 F.2d 593, 595 (10th Cir.), cert. denied, Dutton v. Maynard, 484 U.S. 836, 108 S.Ct. 116, 98 L.Ed.2d 74 (1987). A juror's bias need not be proved with `unmistakable clarity' because `juror bias cannot be reduced to question and answer sessions which obtain results in the manner of a catechism.' Id.

"`"A trial judge's finding on whether or not a particular juror is biased `is based upon determination of demeanor and credibility that are peculiarly within a trial judge's province.' Witt, 469 U.S. at 429, 105 S.Ct. at 855. That finding must be accorded proper deference on appeal. Id. `A trial court's rulings on challenges for cause based on bias [are] entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion.' Nobis v. State, 401 So.2d 191, 198 (Ala.Cr.App.), cert. denied, Ex parte Nobis, 401 So.2d 204 (Ala.1981)."'"
711 So.2d at 1107, quoting Martin v. State, 548 So.2d 488, 490-91 (Ala.Cr.App.1988), aff'd, 548 So.2d 496 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989).
During the voir dire of prospective juror R.L. the following occurred:
"Q[R.L.], let me ask you to tell me what you think about the death penalty?
"AWell, it's a harsh thing, but I mean, you know, it's an eye for an eye.
"QAn eye for an eye. Do you believe if someone is found guilty beyond a reasonable doubt in an intentional murder [he] should automatically get the death penalty?
"AWell, they ought to talk about it.
"QSir?
"AI say, I don't know as you automatically ought to get it, but if he's without any reasonable doubt, I guess he should.
"QHe should? And would you if it was beyond a reasonable doubt and he was found guilty by a jury, would you vote automatically to give him the death penalty?
"Mr. Baker [prosecutor]: I object to how he would vote.
"The Court: Sustained.
"AI would vote for it. I'm not going to say automatically, we'd probably thrash it around there a little bit."
(R. 294-95.) R.L. then indicated that he thought that a sentence of life imprisonment without parole was a "waste of the taxpayers' money." The prosecutor then questioned R.L. as follows:
"QAnd even though philosophically you think that life without parole is a waste of taxpayers' money, that doesn't mean you couldn't follow the law and give it?

*854 "ANo, I mean, like I say
"QThat just has to do with your personal philosophy, not what you would do as a juror?
"A(Nods in the affirmative.)
"QThank you."
(R. 296-97.)
Prospective juror V.R. indicated his feelings in favor of the death penalty. The following occurred:
"The Court [directed to V.R.]: Could you set aside your personal opinions if you found the law was different and I gave you the law on how to consider death versus life without parole and things like this. If it fell within this category could you vote that way?
"Prospective juror [V.R.]: Oh, yes sir, I could do that.
"The Court: You could follow the law
"Prospective juror [V.R.]: I have enough sense to do that, yeah.
"The Court: Okay.
". . . .
"QLet me just clarify one thing, if I may. The Judge has told you that if this trial gets to that stage, that he'll give you some rules or law on whether it should be life without parole or death penalty. And as I understand you, you said, `I'll follow what you say, Judge, and if based on the evidence if it's life without parole, that's what I'll do, if it's death penalty, that's what I'll do.' Is that how I understand you?
"AYes, sir, that's the way I feel.
"QYou will follow the law. And your belief in the death penalty is just that if it fits in that death penalty category, well you believe in it.
"AYes, sir.
"QBut if it fits in life without parole, you believe in that.
"AYes, sir. I don't want anyone to go to death row if there's a doubt in my mind."
(R. 310-12.)
During the voir dire examination of prospective juror T.W., after this juror indicated a preference for the death penalty, the following occurred:
"QLet me ask you this: Now, that's your personal philosophy, right?
"AWell, that's just my belief, sir.
"QThat's your belief?
"AYes, sir.
"QAll right. We all have them. Now, in Court we have laws.
"AThat's correct.
"QNow, if the Judge tells you just because you found him guilty doesn't mean you can automatically give him the death penalty.
"AThat's correct.
"QCan you follow that rule?
"AYes, sir.
"QIf he tells you that you have life without parole and the death penalty and you just choose at random which one you want, but you've got to follow the law
"AThat's correct, that's correct.
"QAll right. Even though if it was left up to you to write the law, it would be written a little differently, if he tells you, `I'm going to give you the law and under your oath you've got to follow the law and make your recommendation to me,' can you follow that?
"AYes, sir, I can.
"QAnd can you recommend life without parole even though personally if there were no law you would like to recommend the death penalty, can you recommend life without parole if you feel that's appropriate under the law the Judge gives you?

*855 "AYes, sir, I can.
"QYou can recommend the death penalty?
"AYes, sir, I can.
"QAnd you will follow the law, not your personal
"ANot my personal beliefs, that's correct.
"QOkay. You can put those aside?
"AYes, sir."
(R. 392-94.)
Jurors who give responses that would support a challenge for cause may be rehabilitated by subsequent questioning by the prosecutor or the court. Cf. Hall v. State, 813 So.2d 113 (Ala.Cr.App.1999). Here, the jurors were questioned in depth by the court or the prosecutor concerning their views on capital punishment. Each indicated that he or she could follow the law as directed by the trial court. The trial court committed no error in denying Johnson's challenges for cause of these potential jurors.

III.
Johnson argues that the trial court erred in granting the State's challenges for cause of two prospective jurors who indicated, he contends, that they had reservations about the death penalty.
The Alabama Supreme Court in Ex parte Smith, 698 So.2d 219, 221 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997), stated:

"Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), allows the prosecution in a capital case to strike for cause those potential jurors who would automatically vote against imposing capital punishment without regard to any evidence that might be developed at trial or those potential jurors whose attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt."
The record reflects that during the voir dire of prospective juror B.T. the following occurred:
"Q [prosecutor]: [B.T.], as I understand it your father was against the death penalty and you are against the death penalty too, is that right?
"AYes, sir.
"QIf the defendant is convicted and the Judge gives you two choices, life without parole and death penalty, would you automatically choose life without parole?
"AYes, sir.
"QAnd you have a preference of life without parole over the death penalty. Do you think that it would bother your conscience for a lack of a better term or if you returned the death penalty in this case?
"AI don't believe I'd be able to sleep or I justit would just bear on my mind.
"QAnd would your feelings so interfere with your deliberations as a juror that you don't think you could give the death penalty fair consideration if you had the choice of life without parole?
"AI would choose life without parole.
"QAutomatically?
"AYes, sir.
"QAnd you favor that automatically even if it was a horrible heinous terrible crime, you favor that automatically above the death penalty?
"AYes, sir.
"QWould you say it would go as much as to torment you if you had to return the death penalty or were faced with that situation, would it torment you?
"ATorment me?
"QTorment you.

*856 "AYes, sir.
"QAnd
". . . .
"QIf you're selected onyou have an opportunity now to tell the Judge whether or not you could return the death penalty. If you're sitting on a jury and the Judge gives you the law and it's clear to you that the death penalty is what should be done, under the law, can you return a death penalty verdict?
"AHonestly, I don't believe I could.
"QI don't mean to push you, but the Judge needs to know. And there's nothing wrong with answering any way you want to answer it, in your heart of hearts in your conscience of conscience could you return a death penalty verdict?
"ANo, sir.
". . . .
"Further examination by Mr. Tatum [defense counsel]:
"QEven if the law as the Judge gave it to you required that you reach that finding, is it your position that you couldn't follow the law?
"AI just don't believe I could give a death sentence.
"QThank you."
(R. 376-79.)
Clearly, as evidenced by the above-referenced portions of the record, this juror unequivocally stated that he could not impose the death penalty under any circumstances. The trial court correctly granted the State's challenge for cause of this juror.
Johnson also asserts that the trial court erred in granting the challenge for cause of prospective juror E.B. The record reflects the following:
"Q [defense counsel]: Now, you answered the questions about the death penalty to Mr. Baker, is that correct?
"AUh-huh.
"QWhat's your view on the death penalty? What is your view on the death penalty?
"AOh, I don't believe in the death penalty.
"QWould you under any circumstances be able to vote the death penalty?
"ANo.
"QIs it your moral or religious or whatever convictions that even though the State of Alabama has endorsed the death penalty or has adopted the death penalty in its statutes
"AI just don't believe the State or anyone else has the right to take another person's life."
(R. 265.)
This prospective juror also unequivocally stated that he could not vote for the death penalty under any circumstances. The voir dire examination of both of the challenged jurors clearly reflects that the juror's views on the death penalty would affect their ability to follow the law and to render an impartial verdict. These jurors were correctly struck for cause. Wainwright.

IV.
Johnson next argues that the prosecutor violated Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), by striking potential black jurors based solely, he argues, on their race.
The record reflects that five black prospective jurors were on the venire. Three of these potential jurors were struck for cause. (On appeal, Johnson does not challenge the strikes for cause of these three black potential jurors.) The State used *857 two of its strikes to remove the remaining two black prospective jurors. The trial court found that a prima facie case of discrimination had been established as to one juror, O.B., and ordered that the State offer its reason for striking that juror. The trial court specifically found that a prima facie case of discrimination had not been established as to juror M.H. because, it noted, "I do recall [M.H.] saying that you [defense counsel] represented his son, which I think is enough grounds to strike anyone ..." (R. 403.)
The State, responding to the Batson objection in regards to O.B., stated:
"All right. [O.B.] wasknows Mr. Tatum [defense counsel] and he admitted that he knows his father, that his father taught him in school. And from every client that was represented[Mr. C., a white prospective juror] was struck and I did that, I probably shouldn't have struck [Mr. C.] butbecause I know [Mr. C.]. And [Mr. C.] would probably make a good juror, but I struck him because I struck everybody who had a family member represented by either.... And as far as [O.B.] does, he isbecause of his relationship with Mr. Tatum's [defense counsel's] father and also because of other answers that he gave added to that on the death penalty and I'd have to go through and find those."
(R. 403-04.)
The record reflects that when the potential jurors were asked if they knew defense counsel Tatum, O.B. responded that Tatum's father was one of his former teachers. (R. 196.) Later in voir dire O.B. gave the following answers to questions concerning the death penalty:
"Q[by defense counsel] ... If a person was convicted and proved beyond a reasonable doubt that he took the life of another person and that constituted a capital offense, do you believe that person should automatically receive the death penalty or would you favor the death penalty?
"ANo, I wouldn't favor the death penalty, you know, if he's guilty
"QYou would what?
"AI said, I wouldn't favor, you know, I wouldn't say he was
"QAutomatic.
"AAutomatic, yeah.
"QBut you would consider the death penalty and consider other options?
"ANo, I wouldn't.
"QSir.
"ANo, I wouldn't."
(R. 332-33.) The State moved that this juror be struck for cause based on his opposition to the death penalty. The State characterized O.B.'s statements as follows:
"Judge I make a motion to strike [O.B.]. He said unequivocally he doesn't favor the death penalty, he wouldn't consider it under any circumstances and then at Mr. Gustin's probing said that he would consider it. It's obvious that he's opposed to the death penalty, would not consider it, I move to strike him."
(R. 334.) Clearly, striking this juror did not violate Batson.
Johnson further contends that the trial court erred in not finding a prima facie case of discrimination as to juror M.H. The trial court indicated that the reason that he was not finding a prima facie case as to this juror was because this juror had indicated that defense counsel Tatum had previously represented his son. The reason advanced by the trial court is contained in the record. (R. 196.) Also, defense counsel, neither at trial or on appeal, questions the validity of that reason for striking M.H. Johnson merely argues *858 that the trial court should have forced the State to articulate its reason.
We have previously noted, in a death-penalty case, that a trial court can find a prima facie case of discrimination as to one prospective juror but not as to another peremptorily struck juror. Ashley v. State, 651 So.2d 1096 (Ala.Cr.App. 1994). Moreover, we fail to see how any possible prejudice could have resulted here. There is no question that the trial court's recollection of the voir dire examination of this juror was accurate. When ruling on whether a prima facie case of discrimination has been proven, the trial court should consider "the type and manner of questions directed to the challenged juror...." Ex parte Branch, 526 So.2d 609 (Ala.1987). That is exactly what the court considered when ruling on the Batson motion. The trial court committed no error here.

V.
Johnson argues that the trial court erred in excluding David Rudolph's testimony. Specifically, he asserts that by excluding Rudolph's testimony, the trial court prevented him from presenting a defense and thereby violated the Sixth Amendment.
During the defense's case Johnson called Rudolph to testify in his behalf. Rudolph, through his attorney, after stating his name and place of residence, invoked his Fifth Amendment right to remain silent. Johnson's attorney made an offer of proof as to Rudolph's expected testimony. Johnson hoped to elicit from Rudolph that Rudolph had seen his codefendant, Morris, on the day of the robbery/murder carrying a gun. Also, he hoped that Rudolph would testify that shortly after he saw Morris he heard gunshots coming from the direction of the BP station. The State asserted that it should be allowed to cross-examine this witness about the circumstances surrounding the meeting, Morris's payment to Rudolph for drugs that he had sold to him, and the fact that Rudolph had a pending indictment against him for trafficking in controlled substances. An in-depth discussion occurred on the record, where defense counsel stated the following:
"The fact of the matter is that we would have to limit our questions on direct to matters that didn't impinge upon his Fifth Amendment rights and the Government would have to limit his cross-examination. Because he has a constitutional right not to incriminate himself the right to cross-examination is simply a rule of evidence as it applies to the State's right to cross-examine the witness in a criminal proceeding. Now, the questions that we are going to ask do not impinge upon this witness's constitutional right to incriminate himself."
(R. 1246.)
After hearing the defense and the State's positions on this point of law the trial court honored Rudolph's invocation of his Fifth Amendment right, noting that to limit the State's cross-examination of this defense witness would interfere with the State's right to a thorough and sifting cross-examination to test the credibility and truthfulness of the witness's testimony. We agree.
The Fifth Amendment to the United States Constitution states in part, that "[n]o person ... shall be compelled in any criminal case to be a witness against himself...." See also Art. I, § 6, Alabama Constitution 1901. In Pennington v. State, 420 So.2d 845 (Ala.Cr.App.1982), we stated the following about this constitutional right:
"The Fifth Amendment insures that a person can not be compelled, when acting as a witness, a party to a civil action, *859 or a defendant in a criminal proceeding, to give testimony which might tend to show that he himself committed a crime. Consequently, in any of these contexts, a witness protected by the privilege may rightfully refuse to answer unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant. Without such protection, if the witness is nevertheless compelled to answer, said answers are inadmissible against him in a later criminal prosecution. Lefkowitz [v. Turley], 414 U.S. [70] at 77-78, 94 S.Ct. [316] at 322-23, [38 L.Ed.2d 274 (1973) ]."
As Justice O'Connor of the Supreme Court of Massachusetts so eloquently wrote in Commonwealth v. Drumgold, 423 Mass. 230, 247-48, 668 N.E.2d 300, 313-14 (1996), concerning the defense's right to present a defense as opposed to the State's right to challenge the credibility of a defense witness:
"The Sixth Amendment guarantees a defendant's right to present a defense, including the right to call witnesses to testify on his behalf. Washington v. Texas, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). Commonwealth v. Durning, 406 Mass. 485, 495, 548 N.E.2d 1242 (1990). Accord Taylor v. Illinois, 484 U.S. 400, 408-409, 108 S.Ct. 646, 654, 98 L.Ed.2d 798 ([1988]). `However, the right to call witnesses is not absolute; in the face of "legitimate demands of the adversarial system," this right may be tempered according to the discretion of the trial judge.' Commonwealth v. Durning, supra at 495, 548 N.E.2d 1242, quoting United States v. Nobles, 422 U.S. 225, 241, 95 S.Ct. 2160, 2171-72, 45 L.Ed.2d 141 (1975). If a judge exercises his or her discretion to limit the defendant's right to call witnesses, the restriction cannot be arbitrary. See Washington v. Texas, supra at 23, 87 S.Ct. at 1925....
"One of the limitations on a defendant's right to call a witness includes the witness's proper invocation of the Fifth Amendment privilege against self-incrimination. Commonwealth v. Francis, 375 Mass. 211, 214-215, 375 N.E.2d 1221, cert. denied, 439 U.S. 872, 99 S.Ct. 205, 58 L.Ed.2d 185 (1978).
". . . .
"`... The Sixth Amendment does not confer the right to present testimony free from the legitimate demands of the adversarial system; one cannot invoke the Sixth Amendment as a justification for presenting what might have been a half-truth.' United States v. Nobles, 422 U.S. 225, 241, 95 S.Ct. 2160, 2171, 45 L.Ed.2d 141 (1975). `Reaching the truth is a fundamental goal of trials, and cross-examination is critical to the process.' United States v. Esparsen, 930 F.2d 1461, 1469 (10th Cir.1991), cert. denied, 502 U.S. 1036, 112 S.Ct. 882, 116 L.Ed.2d 786 (1992). It follows that although a defendant has a right to present witnesses in his defense, that right `does not carry with it the right to immunize the witness from reasonable and appropriate cross-examination.' Lawson v. Murray, 837 F.2d 653, 655 (4th Cir.), cert. denied, 488 U.S. 831, 109 S.Ct. 87, 102 L.Ed.2d 63 (1988)."
The right to a thorough and sifting cross-examination is not a "mere rule of evidence," as defense counsel suggests in its brief to this Court, but it is a right that has been recognized and codified in Alabama. That right is specifically provided for in § 12-21-137, Ala.Code 1975, and in Art. I, § 6, Alabama Constitution 1901. There is absolutely no evidence that the trial court's ruling excluding Rudolph's testimony was arbitrary. The trial court *860 correctly excluded Rudolph's testimony after Rudolph invoked his Fifth Amendment right to remain silent.
Moreover, the defense presented the testimony of several witnesses that Morris had been seen with a .38 caliber gun around the time of the robbery/murder. The defense also presented evidence that Morris had bragged about the incident and had said to friends that "he had hit a lick." Rudolph's testimony, to a great extent, was cumulative of other testimony presented in the defense's case.
Johnson further argues that the trial court erred in not granting Rudolph immunity for his testimony. We do not agree. As we stated in Greenhill v. State, 746 So.2d 1064, 1066-67 (Ala.Cr. App.1999):
"`There is no statutory provision for a general grant of immunity from criminal prosecution under the laws of Alabama. Alabama is one of a number of states that do not have a general statute authorizing prosecuting attorneys to grant immunity from prosecution. Ex parte Graddick, 501 So.2d 444 (Ala.1986); Ex parte Johnsey, 384 So.2d 1189 (Ala.Cr.App.), cert. denied, 384 So.2d 1191 (Ala. 1980). However, prosecuting attorneys and judges are not forbidden from granting an accused immunity from prosecution for criminal offenses in exchange for truthful testimony as a state witness against others accused of crimes. Gipson v. State, 375 So.2d 504 (Ala.Cr.App.1978), aff'd, 375 So.2d 514 (Ala.1979). "[G]rants of immunity play a vital role in the performance of the duties of prosecuting attorneys, and without this method of obtaining valuable testimony prosecuting attorneys would be severely hampered in their efforts to gain convictions." Ex parte Graddick, 501 So.2d at 446. Nonstatutory grants of immunity can be valid in Alabama if they follow the guidelines established in Ex parte Graddick, i.e., the grant of immunity must be signed by the district attorney and approved by the trial judge.'

"State v. Sealy, 728 So.2d 657 (Ala.Cr. App.1997) (emphasis added). See also State v. Seneca, 726 So.2d 748 (Ala.Cr. App.1998). Furthermore, a person may not be forced to accept a tendered grant of immunity and to waive her right against self-incrimination. Ex parte Graddick, 501 So.2d 444 (Ala.1986). The appellant planned to call E.Y. as a defense witness. However, the recognized nonstatutory power to grant immunity applies only to State witnesses. Furthermore, nonstatutory grants of immunity must be signed by the district attorney, and the Franklin County District Attorney's office did not agree to the proposed grant of immunity in this case. Rather, the State informed the court that it had advised E.Y., when it dismissed robbery and felony-murder charges against her, that it reserved its right to present her case to another grand jury at a later date. Furthermore, even if the State and the trial court had agreed to offer E.Y. immunity in exchange for her testimony, E.Y. could not have been compelled to accept the offer and to waive her Fifth Amendment rights. Ex parte Graddick, supra. Accordingly, the trial court properly denied the appellant's request to grant E.Y. immunity and compel her to testify after she had invoked her Fifth Amendment right against self-incrimination."
(Third emphasis added.) As stated in Greenhill, the statutory right to immunity applies only to State witnesses. Rudolph was not a witness for the state. No error occurred here.

*861 VI.
Johnson argues that the trial court erred in allowing evidence of an offense not charged in the indictment to be received at trial.
The State presented the testimony of Debra Ferraro, a former clerk of the Checker Package Store in Jasper, that in March 1996, Johnson had robbed her at gunpoint. She testified that Johnson entered the store, requested two cigars, and threw some crumpled money down. She said that as she retrieved the money and opened the register Johnson pulled a gun and pointed it at her head. He demanded money. He then pulled the trigger, but the gun failed to fire. The trial court allowed this evidence to be presented under the identity exception to the general exclusionary rule. The trial court's ruling was correct.
As this Court recently stated in Tyson v. State, 784 So.2d 328, 343-44 (Ala. Cr.App.2000):
"Rule 404(a), Ala.R.Evid., states: `Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion.' However, there are many recognized exceptions to this general exclusionary rule. Rule 404(b) states:
"`Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial....'
"The State argues, citing Weeks [v. State, 456 So.2d 395 (Ala.Cr.App.1983), aff'd 456 So.2d 404 (1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2051, 85 L.Ed.2d 324(1985) ], that the evidence of the Union Springs shooting fits within the identity exception to the exclusionary rule. This Court stated in Weeks:

"`The evidence about which the appellant complains was absolutely essential to establish the appellant's possession of the murder weapon....
"`This court has stated that evidence of other crimes is admissible in court "when it is necessary to prove the identity of the offender, or of an instrument used in committing the offense." Allen v. State, [380 So.2d 313 (Ala.Cr.App.1979), cert. denied, 380 So.2d 341 (Ala.), cert. denied, 449 U.S. 842, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980) ].'
"456 So.2d at 400.
"However, before a collateral offense can be introduced under the identity exception, two requirements must be met: 1) identity must be an issue, and 2) the collateral crime must have been committed in the `same novel and peculiar manner.' As we stated in Copeland v. State, 455 So.2d 951, 954-55 (Ala.Cr. App.), cert. denied, 455 So.2d 956 (Ala. 1984):
"`It is established in Alabama that admission of evidence of other collateral crimes may not be used as substantive evidence of guilt of the defendant. C. Gamble, McElroy's Alabama Evidence, § 69.01 (3rd ed.1977); Lewis v. State, 399 So.2d 907 (Ala.Crim.App.1981); Breen v. State, 349 So.2d 113 (Ala.Crim.App. 1977). However, there are several exceptions to this general rule. One such exception to this rule, which is applicable in this case, is the identity *862 exception. In order for a collateral crime to be admissible under the identity exception, the crime must have been committed "in the same novel and peculiar manner" as the crime for which the accused is now charged. C. Gamble, McElroy's Alabama Evidence, § 69.01(8) (3rd ed.1977); Smith v. State, 409 So.2d 455 (Ala.Crim.App.1981); Breen v. State, supra. Also, the "identity exception to the general exclusionary rule only becomes applicable when the identity of the person who committed the now-charged crime is in issue." C. Gamble, McElroy's Alabama Evidence, § 69.01(8) (3rd ed.1977); Thomas v. State, 409 So.2d 955 (Ala.Crim.App.1981). There have been a plethora of cases in Alabama dealing with the identity exception, many of which have held that crimes were so similar that they can be said to be the work of a single individual, thus serving the purpose of identifying the accused. See, e.g., Smith v. State, supra; Thomas v. State, supra; Hayes v. State, 384 So.2d 623 (Ala.Crim.App. 1979), cert. quashed, 384 So.2d 627 (Ala.1980); Breen v. State, supra.'"
(Footnote omitted.)
Certainly, the identity of the murderer was at issue. Johnson's defense was that he did not commit the robbery/murder. Also, the crimes were similar. Both were convenience stores and were located on old highway 78 in Jasper about a mile from each other. Both were in walking distance of Johnson's residence. In each instance the robber approached the clerk and threw down crumpled bills to distract the clerk. Each perpetrator was armed with a gun. Also, the Checker's clerk testified that Johnson called her a "Ho" during the incident. There was also testimony that Johnson had told a fellow inmate that he had "killed the Ho" at the BP station.
The trial court correctly allowed evidence of the subsequent robbery to be presented at trial.

VII.
Johnson further argues that the trial court erred in allowing the introduction into evidence during the guilt phase of a photograph that showed the victim's father crying. He contends that it was extremely prejudicial, that it served no lawful purpose, and that it should have been excluded.
We have reviewed the photograph that shows a group of people gathered in the parking lot of the BP station. The people in the photograph are Lawson's parents, friends, and several police officers. Though Lawson's mother did indicate for the jurors the person in the photograph who was her husband, we can only surmise the others in the photograph. The photograph, marked as State's Exhibit 6, contains a woman, whom we believe to be Lawson's mother, who is visibly upset, and a person we surmise is Lawson's father, who has his arm around this woman. Though Johnson argues that this photograph shows Lawson's father crying, we see no gentlemen crying in the photograph. The person who has his arm around Lawson's mother is blocked from view because of the presence of a police officer standing in front of him. Only a portion of this gentleman's head is visible. The photograph, however, does show that the victim's mother was upset.
Although we question the admission of this photograph, which we believe was offered for no purpose other than to show the impact of the victim's death on her family, we do not believe that its admission was reversible error. As the Alabama Supreme Court has previously stated *863 about the admission of victim-impact evidence at the guilt stage of a capital case:
"We agree with Rieber [the defendant] that Mr. Craig's testimony concerning Ms. Craig's children, their ages, and the status of their custody after the murder was not relevant with respect to the question of his guilt or innocence and, therefore, that it was inadmissible in the guilt phase of the trial. The only issue before the jury during the guilt phase of the trial was whether Rieber had robbed and killed Ms. Craig. However, in Ex parte Crymes, 630 So.2d 125 (Ala.1993), a plurality of this Court held in a capital murder case in which the defendant was sentenced to life-imprisonment without parole that a judgment of conviction can be upheld if the record conclusively shows that the admission of the victim impact evidence during the guilt phase of the trial did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant. See, also, Giles v. State, 632 So.2d 568 (Ala.Crim.App.1992), aff'd, 632 So.2d 577 (Ala.1993), cert. denied, [512] U.S. [1213], 114 S.Ct. 2694, 129 L.Ed.2d 825 (1994); Ex parte Parker, 610 So.2d 1181 (Ala.1992), cert. denied, [509] U.S. [929], 113 S.Ct. 3053, 125 L.Ed.2d 737 (1993); Lawhorn v. State, [581 So.2d 1159 (Ala. Cr.App.1990) ]; Hooks v. State, 534 So.2d 329 (Ala.Crim.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989); and Ex parte Whisenhant, [555 So.2d 235 (Ala.1989) ], applying a harmless error analysis in death penalty cases. Our review of the record indicates that Rieber's attorneys did not object to Mr. Craig's brief references to Ms. Craig's children or ask him any questions on cross-examination. The trial court clearly instructed the jury that it had to determine, based on all of the evidence, whether Rieber had robbed and killed Ms. Craig. The jury was instructed that it could not find Rieber guilty unless the prosecutor had established his guilt beyond a reasonable doubt. The jury was also instructed not to let sympathy or prejudice affect its verdict. We caution prosecutors that the introduction of victim impact evidence during the guilt phase of a capital murder trial can result in reversible error if the record indicates that it probably distracted the jury and kept it from performing its duty of determining the guilt or innocence of the defendant based on the admissible evidence and the applicable law. However, after examining the record in its entirety, we conclude that the aforementioned portions of Mr. Craig's testimony, although they should not have been permitted, did not operate to deny Rieber a fair trial. It is presumed that jurors do not leave their common sense at the courthouse door. It would elevate form over substance for us to hold, based on the record before us, that Rieber did not receive a fair trial simply because the jurors were told what they probably had already suspectedthat Ms. Craig was not a "human island," but a unique individual whose murder had inevitably had a profound impact on her children, spouse, parents, friends, or dependents (paraphrasing a portion of Justice Souter's opinion concurring in the judgment in Payne v. Tennessee, 501 U.S. 808, 838, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991))."
Ex parte Rieber, 663 So.2d 999, 1005-06 (Ala.), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995).
Also, the photograph was cumulative of evidence presented through the testimony of the victim's mother. The record indicates that the victim's mother sobbed during *864 her testimony. Moreover, no undue emphasis was placed on it. We are confident, as was the Rieber court, that the admission of this photograph was not reversible error.

VIII.
Johnson further argues that the trial court erred in admitting seven different photographs of the victim, showing her dead body lying behind the counter of the BP station. (State's exhibits 3, 13, 16, 18, 24, 30, 31.) He contends that their prejudicial impact outweighs their probative value and that they were cumulative.
The record reflects that there were no objections to the admission of any of the challenged photographs; therefore, our review is limited to application of the plain-error doctrine. Rule 45A, Ala.R.App.P.
The photographs were admissible and were correctly received into evidence at trial. As stated in Ex parte Siebert, 555 So.2d 780 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990):
"Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence. Chunn v. State, 339 So.2d 1100, 1102 (Ala.Cr.App.1976). To be admissible, the photographic material must be a true and accurate representation of the subject that it purports to represent. Mitchell v. State, 450 So.2d 181, 184 (Ala.Cr.App.1984). The admission of such evidence lies within the sound discretion of the trial court. Fletcher v. State, 291 Ala. 67, 277 So.2d 882, 883 (1973); Donahoo v. State, 505 So.2d 1067, 1071 (Ala.Cr.App.1986) (videotape evidence). Photographs illustrating crime scenes have been admitted into evidence, as have photographs of victims and their wounds. E.g., Hill v. State, 516 So.2d 876 (Ala.Cr.App.1987). Furthermore, photographs that show the external wounds of a deceased victim are admissible even though the evidence is gruesome and cumulative and relates to undisputed matters. E.g., Burton v. State, 521 So.2d 91 (Ala.Cr.App.1987). Finally, photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors. Hutto v. State, 465 So.2d 1211, 1212 (Ala.Cr.App.1984)."

IX.
Johnson further argues that the trial court erred in failing to instruct the jury on voluntary intoxication and manslaughter. There was no objection to the court's failure to instruct on intoxication or manslaughter, thus, we apply the plain-error doctrine. Rule 45A, Ala.R.App.P.
Johnson presented an alibi defense. Several of his friends testified that he, Dewayne Thomas, and Willie Jackson were at Thomas's mother's house drinking at the time of the robbery/murder. Willie Jackson testified that he had been drinking at Thomas's house for about five hours and that he ran out of beer. He said that he went to the BP station and discovered that the clerk had been killed. When he arrived at Thomas's house, directly from the BP station, Johnson and Thomas were sitting on the front porch. Jackson said that even though he had drunk about 12 cans of beer he was not drunk. He said that it takes about 2 or 3 cases of beer to affect his memory. Dewayne Thomas testified that he, Jackson, and Johnson were drinking at his mother's house at the time of the robbery/murder. Another witness, *865 Reginald Bailey, testified that he was with Johnson at the time of the murder and that the group was drinking. However, he recanted this testimony while on the stand. Neither of the witnesses testified concerning the quantity of alcohol that Johnson may have consumed.
First, instructions on voluntary intoxication and manslaughter were inconsistent with Johnson's theory of defense. At no time did Johnson present testimony indicating that he had killed the clerk while he was intoxicated. As this Court has stated concerning an instruction that is inconsistent with the defense theory at trial:
"The State argues that this was not `plain error' because the petitioner himself never indicated any reliance on such a defense; that is, instead of defending on the basis that he had no intent to kill but only to rob, his defense was alibi: he denied being present and denied any knowledge of the crime. Consequently, the State argues, and we agree, that the failure to charge the matter referred to above was not a `particularly egregious error' and would not result in a miscarriage of justice if a reversal was denied. That position follows United States v. Frady, 456 U.S. 152, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982), and the federal `plain error' rule as stated in United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir.1981): `"Plain error" only arises if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.' In that case the court found no `plain error' in an evidentiary ruling after the defendants had failed during trial to assert a theory later argued on appeal."
Ex parte Womack, 435 So.2d 766 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983). See also Davis v. State, 720 So.2d 1006 (Ala.Cr.App.1998), cert. denied, 525 U.S. 1149, 119 S.Ct. 1049, 143 L.Ed.2d 55 (1999). When instructions are inconsistent with the defense strategy, there is no error in failing to give the challenged instruction. McWhorter v. State, 781 So.2d 257 (Ala.Cr.App.1999).
Second, even if were to discard the alibi testimony and focus on evidence of intoxication, we would still find no error. Here, there was absolutely no evidence presented concerning the amount of alcohol Johnson consumed on the day of the robbery/murder. There was absolutely no evidence presented indicating that Johnson was intoxicated. The mere fact that a person has been drinking does not mean that that person is intoxicated. As we stated in Windsor v. State, 683 So.2d 1027, 1037 (Ala.Cr.App.1994), aff'd, 683 So.2d 1042 (Ala.1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997):
"In this case ... there was no evidence that the appellant was intoxicated. Although there was evidence that the appellant had been drinking beer on the day of the robbery-murder, there was no evidence concerning the quantity of beer he consumed that day at the time of the murder. Evidence that someone was drinking an alcoholic beverage is not evidence that that person was intoxicated. There was no `reasonable theory' to support an instruction on intoxication because there was no evidence of intoxication. The court did not err in not instructing the jury on intoxication and manslaughter where there was no evidence that the appellant was intoxicated at the time the robbery-murder occurred."

X.
Johnson further argues that the trial court erred in excluding Chris Parham's *866 testimony that Silas Madison told him that he had driven Morris to the BP station on the date of the murder.
When Chris Parham was called to testify, the State objected to the testimony concerning what Silas Madison had told him about the BP robbery. The Court sustained the objection. After Parham left the stand, the defense made an offer of proof as to what his testimony expected to show. The defense stated that Parham was prepared to testify that Madison had told him that he took Morris to the BP station on the day of the robbery/murder and that Madison told him that Morris killed the clerk. The following occurred:
"Mr. Tatum [defense counsel]: [Silas Madison] hasn't been called as of this date and I suppose we could put him on the stand and if he denied it, we could offer his prior statement, but it's our position that if the person driving the get-a-way car is not a conspirator, then there's no such thing as one."
(R. 1348.) Defense argued at trial and on appeal that this testimony was admissible because, the defense argued, it was a statement against interest and, therefore, met one of the exceptions to the hearsay exclusionary rule.
We have traditionally held that an accused may not prove the guilt of another by presenting hearsay evidence. As McElroy's Alabama Evidence § 48.01(1) (5th ed 1996) states:
"It generally is agreed that the defense, in disproving the accused's own guilt, may prove that another person committed the crime for which the accused is being prosecuted. This right of the criminally accused is often termed `incrimination of another' or `alibi evidence.' The problem which arises in the application of this general rule, however, is the degree of strength that must be possessed by the exculpatory evidence to render it admissible. The task of determining the weight that must be possessed by such evidence of another's guilt is a difficult one.... The appellate courts of Alabama, however, repeatedly enunciate the following guidelines as to the admissibility of such evidence as to another's guilt when offered by the accused.
"The first of such limitations lies in the often repeated statement that the accused can only introduce `legal' evidence of another's guilt. This has been held to mean simply that the accused can introduce only evidence which, under normal evidentiary rules, would be admissible in a court of law. The accused cannot, for example, prove the guilt of another by the use of hearsay statements."
See Flowers v. State, 586 So.2d 978 (Ala. Cr.App.), cert. denied, 596 So.2d 954 (Ala. 1991), cert. denied, 504 U.S. 930, 112 S.Ct. 1995, 118 L.Ed.2d 591 (1992).
Moreover, even if this rule of law did not exist in Alabama the evidence should still have been excluded. Rule 804(b)(3), Ala.R.Evid., states:
"(b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

"(3) Statement against interest. A statement which was at the time of its making so contrary to the declarant's pecuniary or proprietary interest that a reasonable person in the declarant's position would not have made the statement unless believing it to be true."
(Emphasis added.) Absolutely nothing in the record supports the fact that Madison was unavailable to testify. In fact, defense counsel himself, as quoted above, stated that "he supposed" that he could put Madison *867 on the stand. Also, the prosecutor stated at the hearing that Madison was available for them to call as a witness. This testimony was correctly excluded.
Johnson also argues that the hearsay testimony should have been allowed because the statement was a vicarious admission of a coconspirator. See Rule 801(d)(2)(E), Ala.R.Evid. Assuming, for the sake of argument, that there was evidence indicating that Madison was involved in the conspiracy, we would still find no error in the trial court's excluding this evidence. Rule 801(d)(2) states:
"(2) Admission by Party Opponent. The statement is offered against a party and is ... (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."
To meet this requirement the statement must be offered against a party. The statement here was not offered against a party but was offered in Johnson's defense. The plain wording of the rule clearly reflects that the testimony should have been excluded on this basis.

XI.
Johnson also argues that the State erred in failing to disclose the prior convictions of one of its alleged jailhouse informants, Robert Harp. The following occurred before Harp took the stand:
"Mr. Tatum [defense counsel]: Judge, we haven't been furnished an NCIC [National Crime Information Center] on this gentleman and we object to him testifying
"Mr. Gustin [prosecutor]: Well, we're looking right now.
"Mr. Tatum: No, we haven't been provided that.
"The Court: What have you been convicted of Robert, manslaughter?
"The witness: Yes, sir.
"The Court: What else?
"Mr. Baker [prosecutor]: That's it. Manslaughter is not a crime involving moral turpitude and we object to them going into it.
"Mr. Tatum: Well, it goes to his bias, again.
"Mr. Baker: You know what, you're right. It does go to his bias, because of the Aaron case. And he was just arrested. But I agree with you, you're right there.
"The Court: Who was arrested?
"Mr. Baker: In that Aaron case, Stanzell Golden had been arrested and had charges pending. And the Court of Criminal Appeals held that
"The Court: That's Baker [v. State, 568 So.2d 374 (Ala.Cr.App.1990) ].
"Mr. Baker: That's Baker, that's right.
"Mr. Adair: What was the other conviction? Was there another conviction other than that one?
"The witness: Just misdemeanors.
"Mr. Tatum: Have any cases been dismissed?
"Mr. Baker: No.
"The Court: Got any pending?
"The witness: No, sir.
"Mr. Baker: The district attorney's office made you no deals and the sheriff talkedHerbie Brewer, your lawyer, talked with the sheriff and you're going to do the rest of your sentence in the county jail.
"The witness: Right.
"Mr. Baker: Is that what you understand?
"The witness: Yes, sir.
"Mr. Baker: The DA's Office hasn't talked with you about any deal of any kind?

*868 "The witness: Sir, the only thing the district attorney's office done for me was revoke my probation."
(R. 680-82.)
Defense counsel thoroughly cross-examined this witness about the fact that he was serving time in prison for manslaughter, that he had been released and had violated the terms of his probation, and that he had then been reincarcerated, and the fact that he would serve the remainder of his sentence in the county jail.
This Court in Drinkard v. State, 777 So.2d 225 (Ala.Cr.App.1998), stated the following about the State's failure to disclose that a witness had three prior convictions for issuing worthless checks[2]:
"We have ... made it clear ... that not every violation of Rule 16 [Ala. R.Crim.P.] requires the suppression of the undisclosed evidence. E.g. Buchannon [v. State], 554 So.2d [477] at 486 [(Ala.Cr.App.1989) ]; Fortenberry v. State, 545 So.2d 129, 142 (Ala.Cr.App. 1988), affirmed, 545 So.2d 145 (Ala.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990); McCrory v. State, 505 So.2d 1272, 1279 (Ala.Cr. App.1986). Instead, Rule 16.5 `gives a trial judge a number of options to consider in imposing sanctions on a party who has failed to comply with the court's discovery order.' Clifton v. State, 545 So.2d 173, 178 (Ala.Cr.App.1988).
"`Rule 16.5 provides in pertinent part:
"`"If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection; may grant a continuance if requested by the aggrieved party; may prohibit the party from introducing evidence not disclosed; or may enter such order as the court deems just under the circumstances."
"`Whether and to what extent a trial court imposes sanctions for non-compliance with Rule 16 rest "within the sound discretion of the court." McCrory v. State, 505 So.2d at 1279.'

"Pettway v. State, 607 So.2d 325, 330-31 (Ala.Cr.App.1992).
"When the alleged discovery violation came to light, the trial court gave the defense the opportunity to inquire as to whether Beverly Robinson had been convicted of issuing worthless checks, and it also gave the defense the opportunity to recall Ms. Robinson for further questioning in the event that she had been. Under the circumstances, the trial court's remedy was sufficient to address any prejudice caused by the failure of the prosecution to disclose the information regarding Beverly Robinson. Accordingly, no reversal is warranted. See Taylor v. State, 666 So.2d 36 (Ala.Cr.App.), opinion on remand, 666 So.2d 71 (Ala.Cr.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996)."
The trial court's actions in this case were sufficient to eradicate any possible error in failing to disclose Harp's criminal record. No reversible error occurred here.
Johnson also argues that "the trial court should have exercised more control over the testimony which was submitted by the *869 State through its jailhouse informants. The rampant use of such testimony threatens to transform a court of law into a prison pen where different prisoners can settle scores through the offices of the State and the Court." (Johnson's brief, p. 48.)
We find Johnson's argument to be contrary to the theory of defense he presented at trial. Johnson called four witness in his defense who were, at the time of trial, housed either in a state prison facility or a county jail. Clearly, if the trial court had limited the State from calling an inmate, then it would have been obliged to limit Johnson's presentation of his defense. This argument is without merit.

XII.
Johnson argues that there was insufficient evidence to support his conviction for capital murder. He asserts in his brief to this Court that once his accomplices's, Ira Morris's, testimony is excluded, "the other evidence introduced against Mr. Johnson simply was not sufficient to prove beyond a reasonable doubt that he committed a capital murder of Ms. Lawson." (Johnson's brief, p. 92.)
Johnson cites the wrong standard for applying the accomplice-corroboration doctrine contained in § 12-21-222, Code of Alabama 1975. When the testimony of the accomplice is subtracted, the remaining testimony does not have to be sufficient by itself to convict the accused. As we stated in Ingram v. State, 779 So.2d 1225, 1259 (Ala.Cr.App.1999):
"A felony conviction cannot be had on the testimony of an accomplice unless that testimony is corroborated by other evidence tending to connect the defendant with the commission of the offense. Kuenzel v. State, [577 So.2d 474 (Ala.Cr. App.1990) ]; § 12-21-222. The corroboration evidence need not be strong, nor sufficient of itself to support a conviction, the reasoning being that it legitimately tend to connect the accused with the offense; it need not directly confirm any particular fact nor go to every material fact stated by the accomplice. Kuenzel v. State; Andrews v. State, 370 So.2d 320 (Ala.Crim.App.1979). The process for determining whether the accomplice's testimony was sufficiently corroborated is a subtraction process, whereby the accomplice's testimony must first be eliminated and the remaining evidence then examined to determine if it sufficiently connects the defendant with the offense. Carden v. State, 612 So.2d 509 (Ala.Crim.App.1992); Ex parte Bell, 475 So.2d 609 (Ala.), cert. denied, 474 U.S. 1038, 106 S.Ct. 607, 88 L.Ed.2d 585 (1985)."
Here, as indicated above in our rendition of the facts, there was more than sufficient evidence to connect Johnson with the robbery/murder. The trial court committed no error in denying his motion for a judgment of acquittal.

XIII.
Johnson argues that the capital murder charge was unconstitutionally sought and imposed because he is black and the victim was white. Johnson's entire argument in his brief to this Court on this argument consists of one paragraph. There are no citations to the record to support his contention. This argument was not presented to the trial court. Moreover, it is not supported by the record. There is no plain error here. Rule 45A, Ala.R.App.P.

XIV.
Johnson further argues that Alabama's statute limiting attorney fees in capital cases to $1,000 for out-of-court work, § 15-12-21, Ala.Code 1975, violates the *870 state and federal constitution because, he argues, it violates the separation-of-powers doctrine, constitutes a taking without just compensation, violates due process, deprives an indigent of the effective assistance of counsel, and violates the Equal Protection Clause. The Alabama Supreme Court has rejected these arguments. See Ex parte Grayson, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985), and Sparks v. Parker, 368 So.2d 528 (Ala.), appeal dismissed, 444 U.S. 803, 100 S.Ct. 22, 62 L.Ed.2d 16 (1979).
Section 15-12-21, was recently amended to increase the attorney fees in all appointed cases. After June 10, 1999, an attorney appointed to represent a defendant charged with a capital offense has no cap on the attorney fees which he may collect.

XV.
Johnson argues that he was denied a fair trial because of prosecutorial misconduct in the closing argument. He cites several grounds in support of this contention.
"In reviewing allegedly improper prosecutorial argument, we must first determine if the argument was, in fact, improper. In doing so, we must evaluate the prosecutor's comments in the context of the entire trial. Duren v. State, 590 So.2d 360 (Ala.Crim.App.), aff'd, 590 So.2d 369 (Ala.1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992). The prosecution, as well as defense counsel, has the right to present its impressions from the evidence, and may argue every matter of legitimate inference that can be reasonably drawn from the evidence. Sanders v. State, 423 So.2d 348 (Ala.Cr.App.1982)."
Ingram v. State, 779 So.2d 1225, 1251 (Ala. Cr.App.1999). Furthermore, when no objection is made to an allegedly improper argument, "`"[t]his court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful."'" Freeman v. State, 776 So.2d 160 (Ala.Cr. App.1999), quoting Kuenzel v. State, 577 So.2d 474, 489 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991), quoting in turn Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987).
Moreover, here the trial court gave an in-depth jury instruction to the effect that the comments of counsel were not to be viewed as evidence by the jurors.

A.
Johnson argues that the prosecutor improperly vouched for the credibility of witnesses when he made the following comments:
"Ira Morris took some sort of napkin, he's wiping, he's running. He starts, he gets over there, he goes in a different direction than the [plan]. He walks. He goesgets on A Street and he starts walking. The defendant, James Johnson, he takes off on the plan. He goes to a little path back behind where that railroad track is. Just like J.H. [state's witness who testified that Johnson showed him a map of the BP station and the surrounding area several weeks before the robbery/murder] put in his map, it didn't have anything to do with where the BP was and how to get to the BP. You heard J.H. You saw a good lawyer, Charles Tatum, get up there and cross-examine him and his Momma. Credibility. J.H. is credible. He is credible

. . .

*871 "And I submit to you, you saw N.P. [defense witness who was called to contradict J.H.'s testimony] take the stand. And you saw that testimony. You saw that testimony. You heard how N.P. at first gave the same statement J.H. did, same map...."
(R. 1457-58.) (Emphasis added.) Johnson also argues that the prosecutor improperly vouched for another witness when he said, "Tim Smith was up front with you."
Initially, we note that no objection was made to these comments. Therefore, our review is limited to application of the plain-error doctrine. Rule 45A, Ala.R.App.P.
Johnson asserts that these arguments were attempts by the prosecutor to vouch for the credibility of its witnesses, i.e., J.H. and Smith. This Court in Parker v. State, 587 So.2d 1072 (Ala.Cr.App.1991), on remand, 610 So.2d 1171 (Ala.Cr.App.), aff'd, 610 So.2d 1181 (Ala.1992), cert. denied, 509 U.S. 929, 113 S.Ct. 3053, 125 L.Ed.2d 737 (1993), considered whether the prosecutor's argument, "we vouch for the reliability of those witnesses by putting them on the stand and I submit to you that they've told the truth," amounted to reversible error. The Parker court stated:
"`"Attempts to bolster a witness by vouching for his credibility are normally improper and error." United States v. Ellis, 547 F.2d 863, 869 (5th Cir.1977). The test for improper vouching is whether the jury could reasonably believe that the prosecutor was indicating a personal belief in the witness' credibility. United States v. Roberts, 618 F.2d [530], 537 (9th Cir.1980) (citing Ellis, supra). This test may be satisfied in two ways. First, the prosecution may place the prestige of the government behind the witness, by making explicit personal assurances of the witness' veracity. See United States v. Lamerson, 457 F.2d 371, 372 (5th Cir.1972); Gradsky v. United States, 373 F.2d 706, 709-10 (5th Cir.1967). Secondly, a prosecutor may implicitly vouch for the witness' veracity by indicating that information not presented to the jury supports the testimony. See United States v. Brooklier, 685 F.2d 1208, 1218 (9th Cir.1982) (explaining United States v. Roberts, 618 F.2d 530 (9th Cir.1980)).'

"United States v. Sims, 719 F.2d 375, 377 (11th Cir.1983), cert. denied, 465 U.S. 1034, 104 S.Ct. 1304, 79 L.Ed.2d 703 (1984). The question in this case is whether those comments constitute `plain error.'
"In Murry v. State, 562 So.2d 1348, 1353-56 (Ala.Cr.App.1988), this Court thoroughly considered a similar issue. Applying the principles there set out, we conclude that the prosecutor's arguments in this case do not constitute plain error. The remarks, although clearly erroneous, do not `undermine the fundamental fairness of the trial and contribute to a miscarriage of justice.' Murry, 562 So.2d at 1354. Those remarks must be viewed in the context of the prosecutors' entire argument and in the course of the entire trial. `"`[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial.'"' Murry, 562 So.2d at 1354."
587 So.2d at 1094-95. Here, the comments did not rise to the level of the comments that the Court found did not constitute plain error in Parker. We likewise find no plain error here.
Johnson also argues that the prosecutor illegally bolstered its case by stating:

*872 "The defense says, `Oh, the State does not have any evidence.' We have so much evidence that we're going into our second week of putting it on here. They say, `Oh, they cut a deal with Ira Morris.' Where do I wish Ira Morris was? I wish he was in the electric chair tonight. But let me tell you as the longest serving District Attorney in Alabama that when you're District Attorney, there are some hefty weighty decisions that go on your shoulders and you have to make decisions. You see murder and robbery don't happen where the deacon board is meeting, it doesn't happen where the elders are meeting, it doesn't happen where the bishops are meeting, it happens out on the streets and in the stores. It happens where the crack cocaine heads are gathering over in Jones' Village. It happens with the friends of this man that the witnesses that I put on, I didn't choose who they were, I chose his associates. I chose who he was with, I chose who he talked to. I don't manufacture my evidence up in my office, it is what this man did that determined what my evidence was and who I had to put on to get the truth to you."

(R. 1482-83.)
We agree with the State's characterization of this argument. The above remark was a reply-in-kind to remarks made by defense counsel in opening and closing argument that the State's case was a "frame-up." This is permissible argument. Ex parte Musgrove, 638 So.2d 1360, 1369 (Ala. 1993), cert. denied, 513 U.S. 845, 115 S.Ct. 136, 130 L.Ed.2d 78 (1994).

B.
Johnson argues that the prosecutor improperly focused on excluded evidence regarding Johnson's use of illegal drugs. The following occurred:
"And Tim Smith, what did he say? He said, `I didn't know [Johnson's] name, I knew him as Scooter. I later out (sic) find out his name. Well, how did you know him?' Tim Smith was up front with you, `I was over there to buy some crack cocaine.' He was working in a trailer plant in Winston County. `Well, I went over there to get some crack cocaine. I saw my buddy, Scooter, and Ira coming out.' Did you know them? `Oh, yeah, I know them from over at Jones Village.' You heard all the witnesses testify. It is clear as day that that's where crack heads hang out and that's where drug business is done. And Tim Smith, who came by and saw them, he just cruised through the parking lot, didn't see anything going on and went on back to Jones Village to try to do his business and he saw them coming out. I think he said he was backing out. And he said it was Scooter and it was Ira Morris."
(R. 1484.)
The comments made by the prosecutor were all comments based on the evidence presented at trial through Tim Smith's testimony. (R. 693.) Smith testified that the reason he passed the BP station and saw Johnson and Morris was because he was on his way to Jones Village to buy crack cocaine and that he had bought drugs there in the past. "Whatever is in evidence at trial is considered subject to legitimate comment by counsel." Freeman v. State, 776 So.2d 160 (Ala.Cr. App.1999). There was no plain error here.

C.
Johnson argues that the prosecutor mischaracterized the evidence before the jury when he made the following argument:
"Ladies and gentlemen, they planned over a period of two to three weeks what *873 they were going to do. The talk was, all right, let's look at where we're going to go to do this. He said, it was a matter-of-fact talk. They talked about doing Mitch's store, Mitch's store. Mitch carries a gun, he's a man, he's not Ho, he's a man. They talked about Checker's. They talked about Checker's. There's a Ho down there. And then they said, they decided on the BP. There's another Ho.
"I suggest to you that this defendant felt safe. He felt safe because there was a woman in that store. She was alone and it's just another Ho. And he wanted to intimidate her and went in there and took that money because he felt safe that he could get away with that.
"Checker's robbery, same way. He felt safe because it was a female clerk."
(R. 1449-50.) He further asserts that it was error for the prosecutor to state that "And then you saw the tape [of the Checker's robbery]. And you sawyou saw and you felt and you heard the violence of that."
Clearly, the above remarks were all impressions that the prosecutor was arguing from the evidence presented at trial. The clerk at Checker's testified, and the robbery was videotaped and played to the jury, that Johnson came in with a gun and pointed it at her head and demanded money. She also stated that he pulled the trigger but that the gun failed to fire. Certainly, we can infer from the actions described above that Johnson intimidated the Checker's clerk. That is a reasonable inference that may be drawn from the evidence presented and it is a permissible argument. Ingram v. State, 779 So.2d 1225 (Ala.Cr.App.1999).

D.
Johnson argues that the prosecutor argued facts not in evidence when he stated:
"I believe the Judge will charge you that you must believe that James Johnson caused the death of Sissy Lawson in doing acts that caused the death, i.e., shooting and killing her. He intended to kill her. Ira said, `Yes, we planned to kill her because she knew us.' Well, James Johnson's name is in the store. Look under there it says bad checks. There is a blood splatter by the name of James Johnson. You can look at that and find it when you gowhen you go in the jury room. There's a blood splatter and there's the name James Johnson. He was known in that store."

(R. 1496.)
Initially we note that no objection was made to the above-referenced prosecutorial argument. Therefore, our review is limited to whether it constitutes plain error. Rule 45A, Ala.R.App.P.
Johnson argues that there was no direct evidence that he was known in the BP station. The record reflects that Johnson lived within walking distance of the BP station. Morris also testified that for approximately two weeks before the incident they had made plans to commit the robbery/murder. He stated that they knew who was employed at each convenience store in the area, i.e., whether a man or a woman worked at the store and they even knew that one employee carried a gun. Also, a photograph identified and introduced into evidence during the testimony of assistant chief of police Gilbert Jean showed the area behind the counter where the robbery/murder occurred. This photograph contained a "No checksNo exceptions" sign with numerous names on the list. This list contains the name James Johnson indicated by a red check mark. Chief Jean stated that the photograph accurately depicted the area behind the counter. No objection was made to this *874 photograph. Clearly, based on the evidence and the inferences that may be drawn from the evidence, a prosecutor could argue that Johnson was known in this area and that he had been in the store before the robbery/murder.
Also, even though no emphasis was placed on the photograph that contained the "No checks" sign with James Johnson's name on it, the prosecutor was certainly free to argue this evidence during his closing argument to the jury.

E.
Johnson argues that the prosecutor improperly compared him to the victim when he made the following comment:
"Not fair, not fair, not fair. I'll tell you who it's not fair to. It's not fair to Sissy Lawson. Sissy Lawson didn't have a trial go into two weeks...."
(R. 1482.)
Initially, we note that no objection was made to this argument; therefore, we apply the plain-error doctrine. Rule 45A, Ala.R.App.P.
As we stated in McNair v. State, 653 So.2d 320 (Ala.Cr.App.1992), on remand, 653 So.2d 343 (Ala.Cr.App.), on remand, 653 So.2d 347 (Ala.Cr.App.1993), on remand, 653 So.2d 351 (Ala.Cr.App.1994), aff'd, 653 So.2d 353 (Ala.1994), cert. denied, 513 U.S. 1159, 115 S.Ct. 1121, 130 L.Ed.2d 1084 (1995), when determining whether the prosecutor's comments that the victim "cries out for justice from the grave and says, I have rights, too. Give me a fair trial. Listen to me," was error:
"The prosecutor made numerous references to the victim's rights and several times implied that her rights were to be weighed against the appellant's. This was clearly improper. However, we think these references were valued by the jury at their true worth, as having been uttered in the heat of debate and were not expected to become factors in the formation of the verdict. See Duren v. State, 590 So.2d 360, 364 (Ala.Cr.App. 1990), affirmed, 590 So.2d 369 (Ala.1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992); Bankhead v. State, 585 So.2d 97, 106 (Ala.Cr.App. 1989), affirmed as to instant issue and remanded on other grounds, 585 So.2d 112 (Ala.1991) (on rehearing), affirmed on return to remand, 625 So.2d 1141 (Ala.Cr.App.1992); Harris v. State, 539 So.2d 1117, 1123 (Ala.Cr.App.1988)."
Certainly, the comment made in this case is not close to the comment made by the prosecutor in McNair and found not to constitute plain error. No plain error occurred here.

Penalty-Phase Issues

XVI.
Johnson argues that the trial court made numerous errors in its instructions to the jury in the sentencing phase.
When reviewing a trial court's jury instructions, we must view them as a whole, not in bits and pieces, and as a reasonable juror would have interpreted them. Ingram v. State, 779 So.2d 1225 (Ala.Cr.App.1999). "The absence of an objection in a case involving the death penalty does not preclude review of the issue; however, the defendant's failure to object does weight against his claim of prejudice." Ex parte Boyd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998).

A.
Johnson first argues that the trial court erred in not instructing the jury on each statutory mitigating circumstance enumerated in § 13A-5-51, Ala.Code 1975.
*875 Initially, we observe that there was no objection to the trial court's instruction on mitigating evidence. Thus, the failure to object weighs against Johnson's claim of prejudice. Boyd.
Here, the defense argued at the sentencing hearing that the jury should show Johnson mercy because he was the father of two small children and because his codefendant was sentenced to 30 years' imprisonment. Johnson did not present any evidence at the penalty phase concerning the statutory mitigating circumstances enumerated in § 13A-5-51. The trial court's instruction on mitigating circumstances read, in part:
"Mitigating circumstances can include any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death. A mitigating circumstance considered by you should be based on the evidence that you've heard."
(R. 1588.)
The trial court's instructions were consistent with the evidence presented at the penalty phase; they did not constitute plain error. As we stated in Pressley v. State, 770 So.2d 115, 141-42 (Ala.Cr.App.1999):
"The trial judge had no burden to recognize a statutory mitigating circumstance not presented by the defense, and proffer it to the jury.... There is no requirement that the trial court read the entire list of statutory mitigating circumstances to a jury where there was no evidence offered to support each circumstance. Holladay v. State, 629 So.2d 673, 687 (Ala.Cr.App.1992), cert. denied, 510 U.S. 1171, 114 S.Ct. 1208, 127 L.Ed.2d 555 (1994). The trial court's instructions were sufficient. The trial court did not commit plain error by not sua sponte instructing the jury on a statutory mitigating circumstance not offered by Pressley."
See also Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Rieber v. State, 663 So.2d 985 (Ala.Cr.App.1994), aff'd, 663 So.2d 999 (Ala.), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995).

B.
Johnson argues that the trial court erred in instructing the jury that its sentencing determination was a recommendation. He asserts that this instruction diminished the importance of the jury's function.
There was no objection; therefore, our review is limited to determining whether plain error exists. Rule 45A, Ala.R.App.P.
We have previously held that the trial court does not diminish the jury's function by stating in its instruction that its verdict at the penalty phase is a recommendation or an advisory verdict. See Bryant v. State, [Ms. CR-98-0023, November 19, 1999] ___ So.2d ___ (Ala.Cr.App.1999).

C.
Johnson also argues that the trial court erred in relying on its previously given instruction on reasonable doubt that it had given during the guilt phase of the trial. He also challenges the trial court's reasonable doubt instruction.
There was no objection to the court's failure to reinstruct the jury on reasonable doubt. Thus, we are confined to applying the plain-error doctrine. Rule 45A, Ala. R.App.P.
We have previously held that there is no plain error when a trial court, in the penalty phase of a capital trial, relies on a *876 reasonable-doubt instruction it had given in the guilt phase of the proceedings. As we recently stated:
"While we do not wish to be seen as approving the practice during the penalty phase of merely referring to instructions previously given during the guilt phase of a capital murder trial, we conclude that in this case the trial court's reference during the sentencing phase to its previous instruction on reasonable doubt without explicitly instructing on reasonable doubt was not plain error.
"The trial court gave a detailed definition of reasonable doubt during the guilt phase at approximately 5:00 p.m. and then referenced his instruction the following morning at approximately 11:00 a.m. Only a short timeless than 24 hourslapsed between the instructions. Additionally, the trial court asked the jury if it needed to reinstruct on reasonable doubt and no one indicated that he did not remember the previous instruction. `"It is assumed that the jury will consider the previously given instructions along with those given in the supplemental charge."' Collins v. State, 611 So.2d 498, 503 (Ala.Cr.App.1992), quoting Brannon v. State, 549 So.2d 532, 542-43 (Ala.Cr.App.1989), quoting Davis v. State, 440 So.2d 1191, 1195 (Ala.Cr. App.1983), cert. denied, 465 U.S. 1083, 104 S.Ct. 1452, 79 L.Ed.2d 770 (1984).
"Moreover, we find it significant that the instruction on reasonable doubt during the sentencing phase was only applicable, as the trial court instructed, to the finding of the existence of the aggravating circumstances. Reasonable doubt is the state's burden of proof in establishing the aggravating circumstances. Because the jury found Griffin guilty of capital murder, the aggravating circumstance that the murder was committed for pecuniary gain was established as a matter of law."
Griffin v. State, 790 So.2d 267, 338 (Ala.Cr. App.1999).
In this case the trial court stated the following at the beginning of its jury instructions in the penalty phase:
"Ladies and gentlemen of the jury, it's now the duty of the Court to again instruct you or to charge you as to the law. In charging you, I want to remind you of the instructions that I gave you concerning the basic law in defining the term reasonable doubt that we went over this morning, as well as your duties and functions as jurors. And if any one of you feel it necessary, I'll recharge you as to each and every one of those principles with respect to the reasonable doubt, but unless it's otherwise requested, I'll move on. Seeing none, I'll move on."
(R. 1582.) Like the Griffin court, we find no plain error.
Furthermore, we have reviewed the court's instruction on reasonable doubt given during the guilt phase and find it to be both thorough and accurate.

D.
Johnson further argues that the trial court erred in refusing to give an instruction that the jury could return a recommendation of life imprisonment without parole based on mercy.
After the trial court gave the instructions the following occurred:
"Mr. Gustin [defense counsel]: The Court erred in not instructing the jury that if you see fit whether the mitigating circumstances exist or not, you may recommend mercy for James Johnson, the recommendation is solely in your discretion and not controlled by any rule of law. You may make such recommendation *877 with or without a reason. That's the law of the State of Alabama."
(R. 1595.)
The trial court refused to give this instruction. The court's ruling was correct. The requested charge was an incorrect statement of the law. As we stated in Gaddy v. State, 698 So.2d 1100 (Ala.Cr. App.1995), quoting Williams v. State, 601 So.2d 1062, 1081 (Ala.Cr.App.1991), aff'd, 662 So.2d 929 (Ala.), cert. denied, 506 U.S. 957, 113 S.Ct. 417, 121 L.Ed.2d 340 (1992):
"Because the requested charge by the appellant suggests that the jury recommend life without parole arbitrarily and based solely on mercy, the instruction was improper.
"`The jury may not recommend mercy without reason. See Morrison v. State, 500 So.2d 36 (Ala.Cr.App. 1985), aff'd, 500 So.2d 57 (Ala.1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987). The jury does not have an "unfettered option" to recommend a sentence of life without parole unless after weighing the aggravating and mitigating circumstances it finds that life without parole is warranted.'"

XVII.
Johnson argues that he was denied his right to a reliable sentencing determination when the trial court relied upon what, he argues, was a perfunctory and useless presentence report. He cites Guthrie v. State, 689 So.2d 935 (Ala.Cr. App.1996), after remand, 689 So.2d 948 (Ala.Cr.App.1996), aff'd, 689 So.2d 951 (Ala.), cert. denied, 522 U.S. 848, 118 S.Ct. 135, 139 L.Ed.2d 84 (1997), in support of this contention.
In Wilson v. State, 777 So.2d 856, 919-20 (Ala.Cr.App.1999), this Court distinguished Guthrie, and stated:
"The appellant's fourteenth argument is that the trial court relied on an inadequate and cursory presentence report that `failed to provide the trial court with the information necessary for an accurate penalty determination.' (Appellant's brief at p. 96.) Specifically, he contends that `the inadequacies of the presentence report in this instance prevented the trial court from performing its constitutionally mandated weighing of mitigating and aggravating circumstances.' (Appellant's brief at p. 97.)
"In support of his argument, the appellant relies on Guthrie v. State, in which we remanded the case for the trial court `to reconsider [the appellant's] sentence with a sufficient presentence report.' 689 So.2d 935, 947 (Ala.Cr.App. 1996), aff'd, 689 So.2d 951 (Ala.), cert. denied, 522 U.S. 848, 118 S.Ct. 135, 139 L.Ed.2d 84 (1997). However, his reliance on Guthrie is misplaced. In Guthrie, we were concerned because the appellant did not present any mitigating evidence during the sentencing hearings before the jury and the trial court; the appellant's personal and social history had been taken from an interview that was conducted at least five years before his sentencing hearing; the `Evaluation of Offender' section did not contain any information; and, although the report indicated that no psychological reports were available, it showed that the appellant had been incarcerated at Taylor Hardin Secure Mental Facility in 1988. Guthrie, 689 So.2d at 946-47. We explained our reason for reversing Guthrie's conviction as follows:
"`This presentence report's cursory and incomplete treatment of [the appellant] troubles us, because it may have hamstrung the trial court's consideration of the full mosaic of [the appellant's] background and circumstances before determining the proper sentence. As such, this presentence *878 report risked foiling the purpose of § 13A-5-47(b).'
"Id. at 947.
"Unlike the court in Guthrie, the trial court in this case had the opportunity to consider the `full mosaic of [the appellant's] background and circumstances' in sentencing him. The presentence report was dictated on August 27, 1998, one day after the jury recommended a sentence of death and three weeks before the sentencing hearing before the trial court. The `Evaluation of Offender' section contains commentary concerning his reputation within the community. Furthermore, the report includes information about the appellant's physical characteristics, family circumstances, marital status/history, employment history, educational background, arrest record, health, and financial status. Furthermore, during an earlier stage in the case, the probation and parole department had prepared a youthful offender investigation for the trial court's consideration in this case. Additionally, the defense presented proposed mitigating evidence. At the sentencing hearings before the jury and the trial court, through his own testimony and testimony from his father and two church acquaintances, the appellant presented evidence about his background and childhood. Finally, the trial court indicated in its sentencing order that it had considered statutory aggravating evidence and statutory and nonstatutory mitigating evidence in reaching its decision. Clearly, the trial court was not `hamstrung' in its consideration of the appellant's background and circumstances during the sentencing proceedings. Therefore, the appellant's argument is without merit."
777 So.2d at 919-20.
Here, the presentence report is distinguishable from the report the court found offensive in Guthrie. In Guthrie, a notable portion of the report had been left blankthat portion dealing with Guthrie's mental background. Here, there is absolutely no indication that important, possibly mitigating evidence, was omitted or deleted from the presentence report. Johnson argues that the report omits background from his family members and his role as a father. We note that Johnson's mother, Mildred Allen, testified at the penalty phase. She testified that Johnson was raised by her and his grandmother after she divorced when Johnson was nine years old, that Johnson had been raised to know right from wrong, that he had gotten involved with drugs in his early 20s and that he had changed since that time, and that he was the father of two young daughters. Certainly, if any other family information was pertinent to mitigation, Johnson's attorney could have elicited that information from Johnson's mother during her testimony. There is absolutely no indication that relevant information was deleted from the presentence report.
Johnson also argues that the presentence report contained errors because it indicated that Johnson did not have a codefendant. However, as the State argues the trial court was aware of the existence of a codefendant because one of the state's main witnesses was Johnson's codefendant.
We are confident that any alleged defects in the presentence report did not contribute to the trial court's decision to fix Johnson's punishment at death.

XVIII.
Johnson argues that the trial court's sentencing order is deficient and contrary to law because, he says, the court failed to find statutory and nonstatutory mitigating evidence, erroneously double counted robbery *879 as an aggravating circumstance, and the order contains factual errors which prove that the sentence "was unreliably imposed."

A.
Johnson first asserts that the trial court erred in not finding as mitigating evidence that he had "no significant history of prior criminal activity." See § 13A-5-51(1), Ala.Code 1975.
Initially, we observe that the first sentencing order issued by the trial court indicated the following:
"Though the defendant entered a plea of guilty to the offense of robbery in the first degree in another case, the court does not take that into consideration in the determination of the sentence in this case.
"Therefore, the court finds that this statutory mitigating circumstances does not exist."
However, on January 18, 2000, the trial court filed in the Walker County clerk's office a corrected sentencing order. This order indicated that the trial court had made a typographical error in this section of the sentencing order. The court corrected the order to read, "Therefore the court finds that this statutory mitigating circumstance does exist." Rule 29, Ala. R.Crim.P., states:
"Clerical mistakes in judgments, orders, or other parts of the record, and errors arising from oversight or omission may be corrected by the court at anytime of its own initiative or on the motion of any party and after such notice, if any, as the court orders. During the pendency of an appeal or thereafter, such mistakes may be so corrected by the trial court."
The trial court complied with Rule 29, Ala.R.Crim.P., by correcting the sentencing order after the notice of appeal had been filed with this Court. Thus, this contention is without merit.
Johnson also argues that the trial court erred in failing to find that he was substantially impaired at the time of the murder because two witnesses testified that he had been drinking wine or beer at that time. However, as stated above, there was absolutely no evidence in the record concerning the quantity of alcohol that Johnson may have consumed at the time of the robbery/murder. Also, Johnson presented an alibi defense.
As we stated in Woods v. State, 789 So.2d 896, 939 (Ala.Cr.App.1999):
"Although evidence is presented concerning mitigation, the trial court is not obliged to find that that evidence is indeed mitigating. As we stated in Ingram v. State, 779 So.2d 1225 (Ala.Cr. App.1999):
"`Although the trial court is required to consider all mitigating circumstances, the decision whether a particular mitigating circumstances is proven and the weight to be given it rests with the sentencer. Carroll v. State, 599 So.2d 1253 (Ala.Cr.App. 1992), aff'd, 627 So.2d 874 (1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994). See also Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). Moreover, the trial court is not required to specify in its sentencing order each item of proposed nonstatutory mitigating evidence that it considered and found not be mitigating. Morrison v. State, 500 So.2d 36 (Ala.Cr.App.1985), aff'd, 500 So.2d 57 (Ala.1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987)....'"
*880 Johnson also contends that the court erred in not finding his age at the time of the offense, 22, to be mitigating. The trial court stated the following in its order:
"The court finds that the defendant was a young mature male. There is nothing in the record that would indicate that the defendant's age played any part in the commission of this crime.
"Therefore, the Court finds that this mitigating circumstance does not exist."
The court's findings are supported by the record. The record shows that at the time of the robbery/murder Johnson had two daughters, had obtained his GED certificate, and had gone to welding school. There was no evidence presented indicating that Johnson's age played a factor in the crime. Certainly, the planning of the crime and its execution exhibited a mature individual. No error occurred here.

B.
Johnson also argues that the trial court erred in not finding as mitigating evidence the fact that his codefendant, Ira Morris, received a 30-year sentence for the same crime.
This issue was not first presented to the trial court; thus, our review is limited to the application of the plain-error doctrine. Rule 45A, Ala.R.App.P.
Initially, we observe that there is no indication in the record that at the time of Johnson's trial or sentence Morris had been convicted of any offense related to the BP robbery/murder. Morris testified that he had entered into a plea agreement that provided that the prosecution would recommend a 30-year sentence in exchange for his testimony. However, there is no indication that Morris had been convicted as a result of this plea agreement.
Even if Morris had been convicted and sentenced to 30 years, the trial court did not err in failing to find that Morris's sentence was a mitigating circumstance. As we recently stated in Griffin v. State, 790 So.2d 267, 303 (Ala.Cr.App.1999):
"Griffin's reliance on [Ex parte] Henderson[, 616 So.2d 348 (Ala.1992)] is misplaced. Henderson's case was remanded, not because his sentence was harsher than that of his codefendant, but because the trial court failed to consider certain mitigating factors. While the trial court may consider the different treatment of codefendants as a mitigating circumstance, it is not required to do so. We have recently held:
"`[W]hile Parker [v. Dugger, 498 U.S. 308, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991)] and Ex parte Henderson, may suggest that the differential treatment of an accomplice may be a proper subject for consideration as mitigating evidence in a capital case, neither case remotely holds that a trial court is obligated to so find, and neither case lends support to Burgess's claim that the trial court erred in his case. "`Although the trial court is required to consider all mitigating circumstances, the decision whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer.'" Boyd v. State, 715 So.2d 825, 840 (Ala.Cr.App.1997), aff'd, 715 So.2d 852 (Ala.1998), quoting Williams v. State, 710 So.2d 1276, 1347 (Ala.Cr.App.1996), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).'

"Roy Burgess v. State, 811 So.2d 557, 607 (Ala.Cr.App.1998)."
790 So.2d at 303. This claim is without merit.

C.
Johnson argues that the trial court erred in failing to find as nonstatutory *881 mitigating evidence Johnson's love for his family and his efforts to be a productive member of society. As we have stated, "whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer." Griffin. Also, there is no indication in the record that the trial court erred in failing to find this evidence as a mitigating circumstance.

D.
Johnson argues that the trial court erred in counting robbery as both an element of the capital offense and as an aggravating circumstance.
"`Use of an element of the capital offense as an aggravating circumstance is known as `double-counting' or `overlapping' and has repeatedly been upheld. Stewart v. State, 730 So.2d 1203 (Ala.Cr. App.1997), aff'd, 730 So.2d 1246 (Ala. 1999); Windsor v. State, 683 So.2d 1027 (Ala.Cr.App.1994), aff'd, 683 So.2d 1042 (Ala.1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997); Burton v. State, 651 So.2d 641 (Ala.Cr. App.1993), aff'd, 651 So.2d 659 (Ala. 1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.E.2d 862 (1995); Haney v. State, 603 So.2d 368 (Ala.Cr.App. 1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App. 1990) ]. This issue is without merit.'"
Woods v. State, 789 So.2d 896, 938 (Ala.Cr. App.1999), quoting Hall, supra.

E.
Johnson further contends that the sentencing order contains factual errors that indicate that the sentence was unreliable. Specifically, he asserts that the order mistakenly recites that $477.00 was taken in the robbery when the testimony established that $447.00 was taken and that the trial court made a factual error when commenting on the status of the first indictment.
First, we view the misstatement as to the amount of money stolen in the robbery to be an immaterial matter that had no effect on the trial court's decision and the imposition of the death penalty. As we stated in Porter v. State, 666 So.2d 106 (Ala.Cr.App.1995):
"`[T]he value of the property is an immaterial allegation in an indictment for robbery.' Williams v. State, 568 So.2d 354, 357 (Ala.Cr.App.1990). `"Where testimony on the trial of a robbery charge as to the amount of money taken is not in accordance with the allegations of the indictment, such a variance is not fatal and is immaterial."' Williams, 568 So.2d at 357."
We likewise view the misstatement in this case of the money taken in the robbery/murder to be immaterial.
Also, the trial court stated in its sentencing order that the first indictment was nol-prossed before the second indictment was issued. This statement is not supported by the record. The record reflects that the first indictment was dismissed after the second indictment was issued. We likewise find that this misstatement was a minor misstatement of the factual history of the case, which, we are confident, had no effect on the court's imposition of the death penalty.

XIX.
Johnson argues that Alabama's method of execution, the electric chair, results in cruel and unusual punishment, and thereby violates the United States Constitution. Alabama's method of execution has repeatedly withstood constitutional attacks. See Jackson v. State, [Ms. CR-97-2050, May 28, 1999] ___ So.2d ___ (Ala.Cr.App. *882 1999); Williams v. State, 627 So.2d 985 (Ala.Cr.App.1991), aff'd, 627 So.2d 999 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994); Wright v. State, 494 So.2d 726 (Ala.Cr.App.1985), aff'd, 494 So.2d 745 (Ala.1986), cert. denied, 479 U.S. 1101, 107 S.Ct. 1331, 94 L.Ed.2d 183 (1987).

XX.
Johnson last argues that the cumulative effect of the above-stated errors denied him a fair trial. "We have held that when no one instance amounts to reversible error, the cumulative effect can be no greater." Woods v. State, 789 So.2d 896, 938 (Ala.Cr.App.1999).

XXI.
As required by § 13A-5-53, Code of Alabama 1975, we address the propriety of Johnson's conviction and sentence to death by electrocution. Johnson was indicted and convicted of capital murder as defined in § 13A-5-40(a)(2), i.e., murder committed during the course of a robbery.
A review of the record shows that Johnson's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. § 13A-5-53(b)(1), Ala. Code 1975.
The trial court found that the aggravating circumstances outweighed the mitigating circumstances. The trial court found as a statutory aggravating circumstance that the murder was committed during the course of a robbery. § 13A-5-49(4). The trial court found as a statutory mitigating circumstance that Johnson had no significant history of prior criminal activity. § 13A-5-51(1). The trial court found no nonstatutory mitigating circumstances. The trial court stated:
"After considering all matters that were presented to this Court, the testimony heard at the trial, and the sentencing hearing before this Court, both in mitigation and aggravating, taking into consideration all other matters that were proffered before this Court, as hereinabove stated in this Order, and disregarding pleas or references to the Court to consider the sentence on the basis of passion or prejudice, the Court does not find, and is convinced beyond a reasonable doubt, that the aggravating circumstance outweighs the mitigating circumstance and is sufficient to uphold the jury's recommendation that the punishment should be death."
The trial court weighed the aggravating and the mitigating circumstances and sentenced Johnson to death. We agree with the trial court's findings in the present case.
However, pursuant to § 13A-5-53(b)(2), this Court must independently weigh the aggravating and the mitigating circumstances to determine if the death sentence is appropriate. After an independent weighing, we are convinced, as was the trial court, that Johnson's sentence to death is the appropriate sentence in this case.
Section 13A-5-53(b)(3) provides that we also address whether Johnson's sentence is disproportionate or excessive to the penalties imposed in similar cases. Approximately "two-thirds of the death sentences imposed in Alabama involve cases of robbery/murder. Beck v. State, 396 So.2d 645, 654 n. 5 (Ala.1980)." McWhorter v. State, 781 So.2d 257, 330 (Ala.Cr.App. 1999). Johnson's sentence is neither disproportionate nor excessive when compared to the penalties imposed in similar cases.
According to Rule 45A, Ala.R.App.P., we have searched the record for any error that may have affected the substantial rights of Johnson and have found none.
*883 Johnson's conviction of capital murder and his sentence to death by electrocution are due to be, and are hereby, affirmed.
AFFIRMED.
LONG, P.J., and McMILLAN, COBB, and BASCHAB, JJ., concur.
NOTES
[1] In exchange for Morris's testimony at Johnson's trial, the prosecution offered Morris a 30-year sentence for his involvement in the robbery/murder.
[2] There was some confusion in Drinkard as to whether the witness actually had these prior convictions; however, the Court stated that, for the sake of argument, it would assume that she did have three prior convictions for worthless checks.